What's going on? Okay, we're right on time. Hey, I got my marching orders. I understood what you guys wanted. Councilor for the appellant, ready to proceed? Go ahead and pour yourself some water. Go ahead and pour yourself some water. May it please the court and my colleague council, as you know, this is an ADA case. And in rereading my briefs, I'm impressed with how little in 27 years I've learned to be concise. You're not alone. This case collapses itself down to a very simple matter. In the original motion, grant of the motion for summary judgment, the court talks about a lot of things, notices that and the other, but here's the decision. There's simply no dispute, however, that plaintiff was able to and did perform all of his job duties at Simplot. Plaintiff was not actually disabled under the ADA because he continued to work at Simplot after his diagnosis of rheumatoid arthritis. In its decision on my motion of reconsideration, the court again reaffirms that that's the base of its decision and says this court finds, as it previously did, that there is not a dispute that plaintiff was able to and did perform all of his job duties with defendant. Plaintiff was not actually disabled under the ADA because he continued to work for defendant after his diagnosis of rheumatoid arthritis without restriction. Plaintiff has not established that he suffered a physical or mental impairment that substantially limits one or more of the major life activities. In other words, according to the district court, he wasn't disabled, right? Yes. Now, your contention, what was his disability? Okay. According to your position. Okay. Without throwing away the fact that I think that there's a lot of little things at work, that taking is always a disability, the number one thing is he had a disability in sleep. This court has made it very clear in the head case. Well, so you're claiming now he had a disability in sleep. Did you make that case to the district court? I did, Your Honor. Because the district court hardly mentioned anything about sleep, right? Yes. But you argued it to the district court? Yeah, I did. And if you will give me one second in the record. If we go to my client's, it's in my client's affidavit. So just let me read it to you out of his doctor. His doctor says, Mr. Granados reported. This is Dr. Steele. Dr. Atwood. Okay. Excerpt, page 81. Mr. Granados reported his activities outside of work were affected by his arthritis. He reported his pain and discomfort only allowed him to sleep three to four hours at a time. He reported being able to obtain restful sleep, unable to obtain restful sleep, which exacerbates his fatigue and already experienced from arthritis and prescription medications. So all he's doing there is, you know, is giving the patient's history. It's not a diagnosis. Okay. And your decisions. Am I correct? Yes, sir. And when was it first disclosed to Simplot? It was disclosed during the period where basically it began what I call the accommodation process. They suspended him. They said give us any evidence. So it was after the sleeping event in the wrong place, in the bailing room. Yes. So now you're imputing to Simplot knowledge of his physical problems at the time of the investigation? Okay. They were not told about the three or four hours sleep during that time. They were told he had problems with fatigue. However, I don't think that that's not important here. The notice issue was not the basis of the decision. I'm more concerned about what was the intention of the employer at the time of the termination and whether it was, in fact, discriminatory of an impairing physical condition. And apparently, all I know, and best I can tell from reading the record, it was he clearly violated rules of the company. Well, okay, respectfully, there's a factual issue about that because at the time that he was laying down, he was on his break in a place where for 20 years he'd been able to take his break. He even says in his affidavit he wasn't asleep. So if they let him go into this fiber cellar for 20 years and he's on his break and he lies down and he even says he wasn't asleep, what rule did he break? Well, the facts are a little more aggravated than that. I mean, if you accept the description of the surroundings under which he was found taking his break, it sure looks like he was nesting on the boxes there. All right. But I agree with you, but on the other hand, he's entitled theoretically to the inferences in his favor. There's boxes in there, he's on his break, and he lays down on it. The policy is pretty broad. It basically says you can't even make preparations for sleep while you're on the clock, doesn't it? Well, I mean, that's what they said after the fact. Well, but it's in the language of the policy. That's what I'm reading from. All right. Well, even granted that, I mean, there's an important distinction here that, frankly, I think is not well fleshed out in the cases, okay? And that's the distinction between a termination based on discrimination and a failure to accommodate. And I think while you could read the law... We don't have knowledge of the disability, specific knowledge of the disability in our recommendation. I mean, the employment people contacted the doctors after the fact and became aware of problems. But at the time the termination was made, what information did your client make available to the company, either through medical people's actual written reports, telephone conversations, or just his letter of complaint concerning his own physical condition? Prior to termination. No, prior to the sleeping event, because that's what triggered this series of events leading to his termination. Okay. Prior to the sleeping event, the only thing he told them was that he had rheumatoid arthritis. But here's the point. And he was doing his job. He was, okay. Okay. Rheumatoid arthritis and that he needed time to go see his doctor for that. You see, I think the point Judge Beazer is getting at is if he thinks he's entitled to accommodation, he has to let the employer know, one, what his disability is, and two, what accommodation he believes he's reasonably entitled to so that he can pursue his job. But what did he do in terms of, you know, one, informing his employer of his disability? I don't mean even necessarily before he was terminated. At any time. What did he let them know about, one, what his disability was, and two, what accommodation he reasonably believed he was entitled to? Okay. My answer to that is once he's suspended and they say, we're going to investigate, it seems to me that's part of the interactive process. They're going to say, what's going on here? He gives them the following letter. He says, the letter from Dr. Roberts dated 8-28-03, the day before he's terminated, as I recall. It says, Mr. This letter, which this is a letter which Mr. Granados may use at his discretion. His employment involves shift work, and he has been reported to me that he has been sleepy at work. He is currently being treated for an illness that can fatigue him and affect his stamina. Furthermore, frequent changes in sleep cycles is very commonly associated with a difficult time obtaining restorative sleep. This leads to poor job performance and sleepiness. His employer should be aware of this. Now, I'm going to grant, I think this is where you're going, okay? If what you're saying is a guy, manual labor, Hispanic, no education, if what he's required to do when he has this kind of a problem is to go to the employer and say, look, I know my rights under the ADA. I'm entitled to an accommodation. This is exactly what I need. Then, fine, he loses. Okay. But, you know, the work he – the work – I'll tell you something that bothered me about it other than what my friend said at the other end of the bench. This guy is working with machinery, technical stuff. He's not just some dumb, uneducated Hispanic. He apparently has the ability to take care of machinery, which is operating in a potato plant, I assume, climbing ladders, going to the ceiling, changing lightbulbs, all kinds of stuff. But if he were really disabled, I'm disabled and there's a lot of things I won't do in terms of climbing stairs and running around in warehouses and things like that. So it must not have, in his mind, impaired his workability in any respect other than he just decided to take an early break and take a snooze. That's all the employer knew. If I may, that is one inference, and I will even say it's a reasonable inference. Another inference is this. He's been diagnosed with it a month or so before. He's trying to cope with it. He's embarrassed. He doesn't want to go to his employer. In the real world, and I think you know this, you don't make waves. He doesn't want to go to his employer and say, I have a problem. He's dealing with it. He says in the record, sometimes I put my hands like this, and he's made himself, on his break, a little nap. He now gives them more information. They're concerned about it. They contact the Idaho Arthritis Foundation. They say, is it a problem with heavy equipment? Because they know what we're dealing here with is something that has to do with a potential disability. They get some information. If we mean what we say in the decisions, that there's an interactive process and they can't just do a little bit and break it. They knew the guy had a sleeping problem. He's a long-term employee. What kind of problem? You see, my problem is what kind of problem does he know he has? What he told them was very vague. It doesn't amount to a disability. As far as I can tell, what they told him doesn't tell the employer, I'm disabled under the ADA. If he doesn't show he's disabled, then there's no obligation to engage in the interactive process. Now, what precisely was the employer told his disability was? Well, I have trouble sleeping? Well, they were told specifically by Dr. Roberts' letter that this condition caused problems with sleep cycles. I know that, but it's kind of... And couldn't get restorative sleep. We all have problems with sleep cycles. But that's not a disability, major disability. Well, it is under Head and McLinden. Well, no, it depends on how severe it is, how regular, you know, and so forth, right? At this time, there's not that kind of specific showing here. The basis of the decision was that he had no effect on a major life facility. The basis is not that he didn't tell them. Counsel, the problem I have with Dr. Roberts' letter is that it's very brief, but I think fairly read. What he's saying is Mr. Granados is doing shift work, and it's making him sleepy. And there is an illness that he's being treated for which can fatigue him, but that the changes in sleep cycle refer back to the shift work and that he's having a hard time getting restorative sleep. That isn't very specific with regard to the fact that he has rheumatoid arthritis and he's taking medications that are going to make him fall asleep at work, and I think it may be dangerous for him to be working around heavy machinery or doing whatever other duties a mechanic does. And you need to put him on the day shift. I guess if we're going to talk about this issue of notice, which, again, respectfully I don't think is the basis of the decision, the fact that they're out there calling up Idaho Arthritis, talking to a PA that tells them, yeah, these things can cause sleepiness, they're on notice. They know that there's a potential problem. But the problem is that all that occurs after he's found asleep on the job and while he's under suspension and they're considering what discipline to impose. I don't think we can ignore the context in which it occurs. It's sort of the classic situation that we see often where a summary judgment motion is filed against a party and then the other side scrambles to come up with declarations that are self-serving that essentially try to create a contested issue of material fact. And our case law is pretty clear that we don't permit that on summary judgment. And, you know, this would be a very different case if you had prior to the sleeping incident, you had him telling his supervisor, you know, I can't work nights anymore. I'm on this medication and it's making me sleepy and, you know, I need to be able to take a nap in the middle of the afternoon. There's nothing like that in this record. You're giving me the feeling I'm swimming upstream here. Let me just. I'd love to help you. I'm trying to see where the district court erred here in its ruling on summary judgment. I think, I guess this is the question. If an incident occurs, okay, which is relatively minor. It may be against their policy. An incident occurs and as a result of that incident, there is thereafter revealed the fact that the incident is related to a disability. Okay. Can you ignore all that and say we don't have to accommodate because before we ever knew this, this incident occurred? I haven't found any case that says. You can't say it's deliberate discrimination when they don't know what the situation is that they're discriminating about. I'm saying it's a failure to accommodate. And I don't know of a case that says that the duty of accommodation does not exist if you can find something they did before they were aware of the duty and you could fire them anyway. No, but the duty of accommodation is limited only to a disability as defined in the ADA. Right. And so that's a predicate before the duty to accommodate even arises. Right. And as I said, I think under Ed McAleenan, he did have the disability. Okay. I think we understand. Do you want to save the rest of your time for a rebuttal? Thank you, sir. I'm dealing with my own impairment today, a lack of a voice, so I hope I can hold out through my time for oral argument. Did you get some water? We'll move it closer. I do need some water is all I'm asking. Would you like a cup of water that the clerk can bring?       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Okay.     Thank you. Thank you. Thank you. Thank you. In the appellant's brief, and in the appellant's reply brief, and even in argument today, it continues to sound like an unfairness argument of some sort. That may be persuasive on a just cause issue before the National Labor Relations Board, but as the record reflected as the district court found, the appellant withdrew his grievance that the Teamsters Union had filed on his behalf. It also sounds, at least the reply brief, like a Title VII argument. An unsophisticated Hispanic individual couldn't verbalize whatever his requests were. The district court dismissed the Title VII claim as well, and that was not appealed. This is a case of an employee intentionally disregarding a conduct rule. Sleeping on the job is nude. That's the question of whether it's intentional or not. But you see, if your opponent is right, that he raised this argument in the district court that the disability he's claiming is the inability to sleep, what bothers me, frankly, about the district court's opinion, it doesn't mention that claim at all. It says nothing about sleep, right? It just talks about the ability to work. Justice Tshima, you are correct in that there was no specific discussion of sleeping as being the major life activity that was alleged, if it was verbalized in that manner. However, a fair reading of the district court opinion is certainly the order on reconsideration. The court, quoting from the district court, again reviewed the evidence submitted by the parties, including all the reports and letters, and the court determined that he wasn't substantially limited in any activity. And certainly a fair reading of that would be sleeping. But you are correct. There was no specific discussion of sleeping being the major life activity. You know, just off that, maybe this is neither here nor there, but it seems to me this guy has worked there for what, 25, 26, 27 years? Yes. And as far as the record shows, I'll call it his first offense. It seems like a drastic level of discipline for a first offense for a 27-year employee, doesn't it? Justice Tshima, it does seem harsh. You are correct. But as I noted earlier, it is a puzzlement as to why the grievance initially filed by the Teamsters Union was withdrawn. That's why he kind of pursued that. Exactly. That would be a justification. He was here to follow progressive discipline under the collective bargaining agreement. Well, if that was even raised, but correct. But I think he was. Well, I won't make the claim for him if he withdrew it. Although I will concede this. I'd rather be arguing this case than arguing this case before the NLRB on a just cause issue. Okay. Let me ask you to respond to this. This is just a snippet. I know the head case, which is maybe the primary case your point relies on. But it says in there that the head's declaration alleging great difficulty sleeping at night with some improvement when using medication suffices to raise a genuine issue of material fact. That doesn't seem to say much more than the record here, does it? I think this is closer to the Caldwell case and the Pack case and Morton v. Thiokol case. In fact, in Caldwell, where the court discussed the police officer having the difficulty sleeping and comparing his difficulty there, that one has to meet, under the Toyota Motors standard, it has to be substantially and severely restricted. The office would be easier to understand if the district court had said anything specific about having considered, you know, the claim that's, you know, about sleep and the inability to sleep and so forth. But there's just not a word in there about it. You're correct. But, again, I think a fair reading of the opinion is he wasn't restricted from anything. He wasn't substantially impaired in anything. There's simply no evidence of that. Even in the plaintiff's declaration, he talks about three or four. Well, he was restricted from staying awake during his break. Well. How's that? I'll give him that. But even that, he initially stated, or at least stated in his deposition, that the reason he went to lay down is because he was nauseous. It wasn't because he was sleepy. In any event, I'd like to address the reasonable accommodation argument the plaintiff makes. In the briefs, it didn't come up today so much, but the continuing obligation to accommodate, and today the plaintiff continues to say that this is a failure to accommodate. Failure to accommodate what? It still hasn't been articulated with any specificity that I can see anywhere in the record or in argument what the accommodation was. Is the accommodation for an employer to provide a cot, provide a hotel room, to provide a nap on certain schedules? He's never once articulated it. Even in his deposition when he was asked, what do you think we could provide in terms of a reasonable accommodation, the plaintiff talked about, well, maybe some boots would be helpful for his arthritis. So I don't think it's even been articulated. But even going beyond that, this continuing obligation theory, there has to be a starting point. An employee has to ask for a reasonable accommodation before there's any duty to engage in the interactive process. And here, there is no issue. There's no factual issue. It's not contested. He never asked. Apparently, his argument is that it was raised, you know, during the termination investigation, I'll call it, right, when this, you know, he furnished this letter from the doctor. That's when he claims he raised this, you know, this, in effect, I'll call it this implied request for accommodation, right? I think that's giving it a pretty generous read, actually. But that's the claim, isn't it? That's the claim. But that's a pretty hopeful claim, really. It was more or less just an excuse to justify what he had done. Even the medical records that were provided, Dr. Roberts' report talks about shift work, that sort of thing. And the plaintiff mentions, well, we knew about reasonable arthritis before the conduct violations, so maybe that triggered some sort of a duty to accommodate. Well, this circuit, along with the majority of others, has rejected the duty of providing reasonable accommodations in regarded as cases. And the whole idea, you don't, part of the goal of the ADA is to avoid the stereotypic assumptions that people make about people with disabilities. And so the reasonable accommodation shouldn't depend on the perception or the misperception that an employer might have about what an employee might need. So an employee has to put it in issue. He has to ask for it. Even assuming that there could be an issue to get to the jury on whether a major life activity was affected here, he violated a conduct rule, and this court has held that the employer does not have to accommodate misconduct by employees. That's the Collings case. The court has recently followed that. Judge? The case is that? Collings. Is that cited in your brief? Yes. All right. The termination of misconduct is permitted under the ADA, even if it's arguable that the misconduct can be related to the disability. Otherwise, the ADA doesn't protect misconduct. Otherwise, an employer is going to have to tolerate conduct that would be unacceptable by non-disabled people. I mean, that rule is pretty well established, or very well established. And the conduct rule prohibiting preparation for sleeping or sleeping on the job, that really isn't even challenged here, and it probably wouldn't be very significant. When you say that, you mean the legitimacy of the rule? Correct. And it does seem legitimate. Isn't it reasonable that an employer would require employees to be conscious while at work? This is a food processing plant. It's a manufacturing plant. The employee is paid for eight hours. That's how long he's there. He's paid during his breaks. But he claimed it was during break period. It doesn't matter. He's paid during his breaks, and he's subject to recall. The employer needs to know what he's at. If you have a manufacturing plant and something goes down, where's the employee? Is he a block away in a fiber shed where a janitor finds him asleep on a makeshift bed? Well, what about his claim that, well, you know, I've been doing this for 20 years? I don't know what to make of that, really, other than if, in fact, that is true, and that he had been sleeping for 20 years, maybe HR was a little lax in not discovering it before. I don't know. I don't know what to make of that. Again, it might be a persuasive fact to present to the NLRB in a collective bargaining agreement dispute. And it is fatal to his case that he didn't ask for an accommodation. That much is clear. All right. So your position is he never asked for an accommodation? There's no dispute about that. So you're characterizing the medical information that came to the attention of the company during the period of suspension as after-the-fact justification for why he was sleeping as opposed to a request to accommodate his duties as a mechanic? Both, actually. Yes, that's correct, Judge Tolman. Plus, they don't amount to a request for accommodation anyway. A fair reading of the medical information, Dr. Eklund and Dr. Roberts, is what? Where's the request for accommodation? In the cases where this circuit has determined. . . In other words, to amount to a request for accommodation, it has to end with, you know, therefore, because of these conditions, this employer has to be given, you know, let's say a 50-minute break every two hours or something like that. I mean, that kind of specific request? Something like that. Or can you give him an exception to your no sleeping on the break policy so that he can take a 15-minute nap? Sure. Maybe we're pursuing this further than we have to, but let me ask this question. For instance, he did ask for that. Well, a reasonable. . . Suppose a doctor said a reasonable accommodation in this situation would be not to enforce your no sleeping rule against this employee. Would you consider that a reasonable request? Excuse me, Judge Tom, what was the question? I'm sorry, my voice is sort of like yours. Suppose the doctor had ended his letter by saying because of this patient's conditions, a reasonable accommodation would be not to enforce your no sleeping rule against him. Right? Would you consider that request to be a request for a reasonable accommodation or something you could not accommodate because of your, I don't know, working requirements? Well, I don't know how you could possibly accommodate that, so therefore it wouldn't be reasonable. But even so, it's after the fact and it directly violates the conduct rule, but I don't know if that answers your question or not. Okay. But this circuit's very clear. The case we provided to the Court recently, the Wells v. Mutual of Enumclaw case, if the employee doesn't ask for reasonable accommodation, there's no reasonable accommodation case. What do you say recently? Is that in a 28-J letter or what? What do you mean by recently? Yes. Yes? Yes. Yes, we submitted authority, Wells v. Mutual of Enumclaw, July 2507 case. Okay. Unless you have anything else, counsel, I think we have your position in mind. Well, even if plaintiff was able to survive those numerous hurdles, which I think are dispositive actually, you get to the burden shifting. Simplot has clearly articulated a nondiscriminatory legitimate reason for termination. I think your record's very clear on all of them. I mean, what the employment office did in terms of their survey and their understanding their report back and the reasons why the events that occurred occurred. So that's been articulated. There's been no evidence or no contention that is pretextual. So this case degrades the importance of the ADA. The ADA is to protect people with disabilities and significant impairments. Thank you very much, counsel. Thank you. Mr. Steineger. Thank you, gentlemen. Let me read you two significant cases that haven't been mentioned. Which case? Two cases. I'll just one sentence from each and I'll give you the citation. One, an employee is not required to use any particular language when requesting an accommodation but need only inform the employer of the need for adjustment due to a medical condition. That's Zivkovic versus Southern California Edison. The site's at page 6. It's 302, Fed 3rd, 1082. The second, that was from my reply brief, page 6, my opening brief, page 27. Moreover, an employee is not required to request an accommodation in writing and need not use specific words to make the request. He didn't make any requests of any kind in writing or orally prior to the event, right? But what he did do, and excuse me, there's one more case just above that. The interactive process for finding a reasonable accommodation may be triggered by a request by the employee or by the employer's or by the employer's recognition of the need for such an accommodation even if the employee does not specifically make the request. Brown versus Lucky Stores. That's the Ninth Circuit case, 246. I think we fit into that. I think the issue of this business of whether or not they had to bend the rules to make an accommodation. And let me just, something just came up to me, and I'll close with it and be gone other than your questions. I had a grandfather who, great-grandfather, from New York State. He actually was a friend of Robert Jackson. He started out as an orphan. He had no education. He built a bank. It was the first bank in the Marine. And he had a strict rule.  They had to stand. There was no stools. So let's consider that case. And today, now we have the, and he fires somebody because he sees him sit down. The spirit of this act is dead if they can do that as far as I'm concerned. Once they realize, okay, he broke a rule, but now we have to balance here and say, was the disability involved in this rule? And is it reasonable that he take a little nap if he's fatigued? That's all we're asking. Well, you know, the scope of the rule is a little broader than that. There were specific areas in the plant set aside for lunch and rest periods. Number one, he decides to take his rest period in an operating or another part of the plant, not even permitted, plus sleeping. I mean, the conduct is not as narrow as you would like to make it. Yeah, but the record is they permitted him to do it for 20 years. And so I think the reason. Permitted him to do it or he did it and never got caught for 20 years, which would be another way to look at it. Well, but we're entitled to the inferences. I don't think that's. That the employer knew that he was nesting in the fiber shed for 20 years? I don't, in fairness, we didn't say that the employer knew he was nesting for 20 years. What we said was their position was he has to take the break in the lunchroom. That's our policy. And the record shows he's done it for 20 years, and I think he's. So the inference would be that they must have known their employees were taking breaks elsewhere throughout the plant. Yes. That's all I have to say. Oh, I guess I have one other thing in terms of this, their policy and how strict it is, that it's applied to everybody else the same, and that is I abandoned the Title VII claim, but there is evidence in the record that they had a white male who fell asleep and was found asleep, and they didn't fire him. Now, they said, well, it was inadvertent, but their policy doesn't say you can't sleep unless it's inadvertent. And so I don't know what, from my view of the law, I don't think this is particularly critical, but at least in terms of your understanding, do they have this policy that's strictly applied? No. Thank you very much. Appreciate the opportunity to be here. Thank you both, counsel. I appreciate your argument, and Granados v. J.R. Simplot is submitted. And that concludes our calendar for today, and we are adjourned for the week.
judges: Beezer, Tashima, Tallman